## BOARD OF COM'RS OF TULSA COUNTY, OKL., v. UNITED STATES.

### No. 1592.

Circuit Court of Appeals, Tenth Circuit.

Jan. 19, 1938.

WILLIAMS, Circuit Judge, dissenting in part.

John F. Conway, Asst. Co. Atty., of Tulsa, Okl. (Dixie Gilmer, Co. Atty., and Philip N. Landa, both of Tulsa, Okl., on the brief), for appellant.

Chester A. Brewer, Asst. U. S. Atty., of Tulsa, Okl. (Carl McFarland, Asst. Atty. Gen., Whitfield Y. Mauzy, U. S. Atty., of Tulsa, Okl., Charles E. Collett and Wm. H. Churchwell, both of Washington, D. C., and Oscar A. Provost, Sp. Atty., of Helena, Mont., on the brief), for the United States.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

LEWIS, Circuit Judge.

Pansy B. Hawk, nee Lloyd, of one-eighth Indian blood and a member of the Cherokee tribe, received her allotment of tribal lands and selected therefrom thirty acres as her homestead pursuant to the Cherokee Allotment Act of July 1, 1902, 32 Stat. 716, which was ratified by the tribe as the act required on August 7, 1902. She received a separate deed from the Chief of the Cherokee nation to her homestead of date February 24, 1905.

On February 18, 1936, appellee at the request of the Secretary of the Interior instituted this action to recover $3,426.61, the amount of general taxes and special improvement assessments that had been levied on her homestead and which she had paid under protest to prevent sale thereof by appellant for the years 1910, 1911, 1923, 1924, 1926, 1927, and 1928, and 6% on said sum from dates of payments. Appellee

recovered judgment as prayed from which this appeal was taken.

It was agreed by counsel at the trial that Pansy B. Hawk owned and held her homestead so allotted to her at the times and during the years for which it was assessed and taxed and that the gross sum stated is the total amount that she paid as taxes, penalties, redemption fees, and special benefits designated as sewer tax.

That Cherokee homesteads acquired under the Allotment Act of July 1, 1902, are non-taxable as long as they are held by the allottees seems to have been settled by the decisions in Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 567, 56 L.Ed. 941, and the two cases that immediately follow it. Those cases have to do with the allotment acts of the Choctaw and Chickasaw, and Creek tribes, but we think the exemptions there under consideration were equivalent in principle to the one here involved. The relations between the Five Civilized Tribes and the United States in the division of the tribal lands between the members of the tribes in severalty was contractual. The Cherokees were given the privilege of determining by vote of its members whether it would accept the proposals. They did accept. The constitution of the state of Oklahoma, as stated in the Choate Case, provided "that property exempt from taxation by virtue of treaties and Federal laws should so remain during the force and effect of such treaties or Federal laws." It was therefore held that the acceptance of deeds containing exemption of the land from taxation under the allotment acts operated as full performance by the allottees of the contract and created a vested right in the Indian of the exemption which is protected by the Fifth Amendment. See, also, Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478, and Grotkop v. Stuckey, 140 Okl. 178, 282 P. 611. Section 13 of the Cherokee Agreement, 32 Stat. 716, 717, is in part this:

"Separate certificate shall issue for said homestead. During the time said homestead is held by the allottee the same shall be non-taxable."

The principal contention of appellant is that the statutes of limitation of the state of Oklahoma are applicable in this case and bar recovery, not because of their vigor standing alone, but because Congress, they contend, made them applicable by the Act of April 12, 1926, 44 Stat. 239, which is entitled, "An Act To amend section 9 of the Act of May 27, 1908 (Thirty-Fifth Statutes at Large, page 312), and for putting in force, in reference to suits involving Indian titles, the statutes of limitations of the State of Oklahoma, * * * and for making judgments binding on all parties, and for other purposes." It is section 2 of that act, 44 Stat. 240, on which appellant relies and it reads thus:

"The statutes of limitations of the State of Oklahoma are hereby made and declared to be applicable to and shall have full force and effect against all restricted Indians of the Five Civilized Tribes, and against the heirs or grantees of any such Indians, and against all rights and causes of action heretofore accrued or hereafter accruing to any such Indians or their heirs or grantees, to the same extent and effect and in the same manner as in the case of any other citizen of the State of Oklahoma, and may be pleaded in bar of any action brought by or on behalf of any such Indian, his or her heirs or grantees, either in his own behalf or by the Government of the United States, or by any other party for his or her benefit, to the same extent as though such action were brought by or on behalf of any other citizen of said State."

It will be observed that section 9 of the Act of May 27, 1908, 35 Stat. 315, both before and after it was amended by the Act of April 12, 1926, dealt only with sale, descent and devise of lands that had been allotted; that section 2 of said Act of April 12, 1926, uses words appropriate only to land titles—heirs or grantees; and that the title of that act refers "to suits involving Indian titles." Each of these references may be considered in determining the intent of Congress. Likewise section 3, the last section of said Act of 1926, 44 Stat. 240, presents and deals with this situation: "Any one or more of the parties to a suit in the United States courts in the State of Oklahoma or in the State courts of Oklahoma to which a restricted member of the Five Civilized Tribes in Oklahoma, or the restricted heirs or grantees of such Indian are parties, as plaintiff, defendant, or intervenor, and claiming or entitled to claim title to or an interest in lands allotted to a citizen of the Five Civilized Tribes or the proceeds, issues, rents, and profits derived from the same, may serve written notice of the pendency of such suit upon the Superintendent for the Five Civilized Tribes, and the United States may appear

in said cause within twenty days thereafter," and having been made a party may participate in the trial of said cause in the state court or have it removed to the federal court in said state on petition, where it shall be tried. The suit above described must be one claiming "title to or an interest in lands allotted to a citizen of the Five Civilized Tribes or the proceeds, issues, rents, and profits derived from the same."

Also the legislative history of the Act of 1926 is strongly persuasive that Congress intended that the Oklahoma statute of limitations should be applied only when title to lands that had belonged to the Civilized Tribes was involved or claimed rights to benefits or profits therefrom. When the bill was in the House the report of the Committee on Indian Affairs to which it had been referred contained this: "The entire bill is designed to stabilize titles in eastern Oklahoma and it is expected that it will add value to these lands." When it was in the Senate the Committee on Indian Affairs said the bill was, "for putting in force in reference to suits involving Indian titles, the statute of limitations of the State of Oklahoma". These sources of inquiry open to us are convincing that the intention and purpose of the Act of 1926 was to make applicable only the statutes of limitation of the state of Oklahoma in suits where the issues involved title to allotted lands of the named tribes. United States v. Katz, 271 U.S. 354, 46 S.Ct. 513, 70 L.Ed. 986; Cramp & Sons Co. v. Curtis Turbine Co., 246 U.S. 28, 38 S.Ct. 271, 62 L.Ed. 560; United States v. Great Northern Railway Co., 287 U.S. 144, 53 S.Ct. 28, 77 L.Ed. 223; Knowlton v. Moore, 178 U.S. 41, 65, 20 S.Ct. 747, 44 L.Ed. 969; United States v. Palmer, 3 Wheat. 610, 631, 4 L.Ed. 471; Grier v. Kennan, 8 Cir., 64 F.2d 605. This is a personal action, in assumpsit. Nor does it involve the "proceeds, issues, rents or profits" derived from allotted lands.

■ The complaint alleges that the United States of America brings this action in its own right in behalf of its Indian ward Pansy B. Hawk for the recovery of taxes wrongfully exacted from said Indian by Tulsa County upon lands located therein which were exempt from all taxation. The appellant by motion to dismiss and also by answer denied that Pansy B. Hawk is a ward of the plaintiff and contends that appellee has no right to institute and maintain the suit. In support of that contention appellant relies upon the fact that the Act of May 27, 1908, 35 Stat. 312, in its first section contains this: "All lands, including homesteads, of said allottees enrolled as * * * mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions." It is argued that the language just quoted from the Act of May, 1908, emancipated Pansy B. Hawk from guardianship; that thereafter she was no longer a ward; and that the suit could not be instituted or maintained by appellee. That act dealt with their capacity to dispose of their allotments. Other statutes dealt with their capacity not based on the quantum of Indian blood to look after their affairs and empowered the Secretary of the Interior to issue certificates of competency to those who were in his judgment capable of caring for their own interests, authorizing those to whom certificates were issued to exercise full dominion, control and disposition of their property. We are disposed to take the word "restrictions" in the Act of 1926 as applicable against those only who were without certificates. Presumptively they were without the requisite capacity and in that sense restricted. The guardianship of the United States over Indians has been exercised from an early day. The policy of the Indian allotment acts has been with the view of gradually bringing them to a state of competency in order that they might be capable of attending to their own affairs. It seems obvious that Pansy B. Hawk was not capable of protecting her own interest against the unlawful exactions for which the United States here sues. She wholly neglected to take the necessary course for that purpose. But whether that be the true view to take of this phase of the Act of 1926 seems to us unnecessary for determination in this case. No act of Congress has been brought to our attention by counsel or discovered by us terminating the long continued guardianship either entirely or as to specific classes of Indians, and until that has been done we are disposed to recognize the right when it is asserted by the United States in the institution of suits for their protection. That seems to be the view taken by the Supreme Court in United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192. See, also, Choteau v. Burnet, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353.

The judgment appealed from is affirmed.

WILLIAMS, Circuit Judge (dissenting in part).

Items in Exhibit B, as a part of plaintiff's bill, herein sued for, are as follows:

Tax Paid ................$2,141.86
Penalty ...................   231.35
Redemption Fees .........    39.00
Sewer Assessments ....... 1,014.40

                          $3,426.61

Said exhibit shows that this homestead had been platted into Homestead Valley Addition to the City of Tulsa prior to 1923, and into lots and blocks, and a sewer assessment, commonly called a "tax," of $1,-014.40, without any penalty or other fee, having been paid, was sued for.

I concur in that part of the judgment for the recovery of the ad valorem tax and penalty and fees in the sum of $2,412.21, together with interest thereon at rate of 6 per cent., but as to that part of the judgment for the sewer assessment tax I am unable to agree.

It will be observed that the sewer tax, no penalty or interest being collected, became payable in December, 1926, the said land having become a part of the Homestead Valley Addition prior to 1923. Section 13 of the Cherokee Allotment Act or Treaty, being Act of Congress of July 1, 1902, 32 Stat. 716, 717, provides that during the time said homestead is held by the allottee the same shall be nontaxable and shall not be liable for any debt contracted by the owner thereof while so held by him.

In Powell v. City of Ada, 10 Cir., 61 F.2d 283, 285, it is held that Chickasaw Indians' restricted allotment was not subject to special assessment for municipal and other such improvement and assessment against such land, in an addition to the city, and that street improvement assessment against same was invalid. See, also, United States v. Southern Surety Company, D.C., 9 F.2d 664, 665; Stuckey v. Kays, 119 Okl. 227, 249 P. 416; Grotkop v. Stuckey, 140 Okl. 178, 282 P. 611; Board of Com'rs of Garvin County v. Dennis, 140 Okl. 204, 282 P. 457; and Broadwell v. Board of Commissioners of Bryan County, Oklahoma, 88 Okl. 147, 211 P. 1040.

In these cases where the judgment was for moneys collected, interest being allowed, the question was not involved as to assessment for municipal improvements, such as sewer, paving, or other street improvement.

Under section 6044, article 3, chapter 33, Oklahoma Statutes 1931, 11 Okl.St.Ann. § 271, in force prior to the time the sewer assessment was made and taxes collected, it is provided: "In all cities and towns where there is maintained and operated a system of public water works, the mayor and council or board of trustees shall have power to cause a general sanitary, storm or combination sewer system to be established, which shall be composed of three classes of sewers, * * * public, district and private sewers."

Under section 6045, 11 Okl.St.Ann. § 272, that: "Public sewers shall be established along the principal courses of drainage, * * * under such regulations as may be provided by ordinance and these may be extensions or branches of sewers already constructed or entirely new throughout."

Section 6046, 11 Okl.St.Ann. § 273, provides that: "Construction and maintenance of public sanitary sewers and storm sewers in cities and towns shall be paid * * * by the city or town, except that where a petition signed by * * * more than one-half in area of the land that will be drained or benefited by the construction of such mains or sub-mains, the mayor and council or the board of trustees or other legislative body may create a district and order the construction of such mains and sub-mains and provide for the payment therefor to be made by the owners of the property included within such district in accordance with the procedure for the construction of and payment for district sewers as is provided in Section 4405, of the Compiled Oklahoma Statutes, Annotated, 1921; [6050] laterals shall be paid for by the owners of the property abutting on such laterals, in the manner provided by law for the estimate of cost and assessments for district sewers; * * * such amounts to be charged for connections with mains and sub-mains, or for mains or sub-mains used as laterals to be ascertained by the city or town engineer, or the engineer in charge of such work, and assessed against the property and collected in the manner provided by law in the case of district sewers."

Section 6047, 11 Okl.St.Ann. § 274, that: "The council or board of trustees shall cause sewers to be constructed in each district whenever a majority of the property holders, residents therein shall petition therefor: * * * Provided, However, that the property owners shall have the right to construct the lateral sewers abutting

their own property under the direction and supervision of the city engineer and at such time as the city engineer may prescribe. * * * But the city shall incur no liability for building district sewers, except when the city is the owner of a lot within the district, and in that case the city shall be liable for the costs of said sewer in the same manner as other property owners within the district."

Section 6048, 11 Okl.St.Ann. § 275, that: "Private sewers connecting with the public and district sewers may be constructed under such restrictions and regulations as the mayor and council or president and board may prescribe by general ordinance; but the city shall be at no expense in the construction, repairing, or cleaning of the same: Provided, However, that the owner of any lot abutting any district sewer may, at his option, construct the said sewer along his lot, which shall be constructed at the same time and in conformity to the balance of said sewer."

Section 6050, 11 Okl.St.Ann. § 277, that: "Whenever the mayor and councilmen or the board of trustees shall deem district sewers necessary, they may proceed without the petition hereinbefore provided for. * * * Upon the completion of the plans and specifications and their adoption by the mayor and council or the board of trustees they shall advertise for sealed bids for the performance of such work, for at least ten days * * * which notice may contain any reasonable conditions to be imposed by the mayor and council or the board of trustees with reference to the letting of such contract, and may require the giving of a good and sufficient bond for the faithful execution of the work, and for the protection of the city and all property owners against any loss or damage by the negligent execution of such work. The notice shall also advise all parties interested that they may appear and protest against said proposed improvement or any part thereof. At the time and place specified in the notice, the mayor and council or the board of trustees shall if they find such improvement necessary and proper, award the contract to the lowest and best bidder for the work, which contract shall in no case exceed the aggregate estimate of costs submitted with the plans and specifications and shall be subject to the right of the mayor and council or the board of trustees to reject any and all bids and to re-advertise for other bids when none of the same are,

in their judgment, satisfactory: Provided, that where a majority of the property owners in any block, petition the mayor and council or the board of trustees for a lateral sewer through or in such block, the advertising for bids shall not be necessary, but the mayor and council or the board of trustees may cause such improvement to be made without such notice."

Section 6051, 11 Okl.St.Ann. § 278, that: "As soon as any district sewer shall have been completed, the city or town engineer or other officer having charge of the work shall compute the whole cost thereof, which shall also include all other expenses incurred by the city or town in addition to the contract price of the work, and shall apportion the same against all the lots or pieces of ground in such district exclusive of improvements, in proportion to the area of the whole district, exclusive of the public highways, and such officer shall report the same to the mayor and councilmen, and the mayor and councilmen or the board of trustees shall thereupon levy and assess a special tax, by ordinance against each lot or piece of ground within the district, which ordinance shall be published in some newspaper of general circulation in the city for four consecutive weeks, and if, at the expiration of such time, the amount named in such ordinance, together with the cost of publication, shall not be paid, then the mayor and councilmen or the board of trustees shall cause tax warrants to be issued against such lots and pieces of ground in said district, which tax warrant shall recite the date of the passage of the ordinance making the assessments, the amount of the assessment, the description of the property against which the same is levied, and that the same will be levied against said property in three equal installments with interest thereon at the rate of eight per cent per annum, levied each year, to become due on the fifteenth day of December next after each such levy, to pay the maturing installments and said tax warrants shall be signed by the mayor or president, as the case may be, and countersigned by the city or town clerk, and shall be delivered to the contractor: Provided, that the aggregate amount of such warrants delivered to the contractor shall not exceed his contract price, and the city shall hold and retain for its own indemnity a sufficient amount of the same to cover other expenses than the contract price of executing the work."

Section 6053, 11 Okl.St.Ann. § 280, that: "No suit shall be sustained to set aside any assessment or certificate issued in pursuance of any assessment or to enjoin the city council or town board from making any improvement, unless brought within sixty days after the passage of the ordinance making such assessment: Provided, that in the event any special assessment shall be set aside or be invalid in whole or in part, the city council or town board may, at any time, in the manner herein provided for an original assessment, proceed to cause a new assessment to be made, which shall have the like force and effect as an original assessment."

In Powell v. City of Ada, Oklahoma, supra, it is said: "This restricted land can neither be encumbered nor taxed."

The sewer assessment tax was on the following lots in the Homestead Valley Addition, into which the said allotment of Pansy B. Hawk was platted, as follows:

| Description | Date Paid | Year | Sewer Tax |
|---|---|---|---|
| Lot 22, Block 1, Homestead Valley Addition | 1-17-28 | 1926 | $ 19.38 |
| Lot 23, Block 1, Homestead Valley Addition | 1-13-27 | 1926 | 18.74 |
| Lot 11, Block 1, Homestead Valley Addition | 1-13-28 | 1926 | 19.50 |
| Lot 12, Block 1, Homestead Valley Addition | 1-13-28 | 1926 | 19.50 |
| Lot 14, & 23, Block 1, Homestead Valley Addition | 1-13-28 | 1927 | 35.04 |
| Lot 14, Block 1, Homestead Valley Addition | 1-13-28 | 1927 | 18.74 |
| Lot 11, 12 & 13, Block 1, Homestead Valley Addition | 1-13-28 | 1927 | 52.56 |
| Lot 22, Block 1, Homestead Valley Addition | 1-17-28 | 1927 | 17.52 |
| Reserve, less tract N100 S300 E67 | 4- 2-28 | 1927 | 198.68 |
| Reserve, less tract N100 S300 E67 | 7-27-29 | 1928 | 201.09 |
| Lots 14, 15, 16 & 17, Block 1, Homestead Valley Addition | 1-13-28 6-15-27 | 1926 | 72.51 |
| Lots 18, 19 & 20, Block 1, Homestead Valley Addition | 3-14-27 | 1926 | 48.90 |
| Lot 24, Block 1, Homestead Valley Addition | 11-7-27 | 1926 | 18.73 |
| Lot 24, Block 1, Homestead Valley Addition | 3-26-28 | 1927 | 18.30 |
| Lot 13, Block 1, Homestead Valley Addition | 3- 2-29 | 1928 | 16.31 |
| Lot 13, Block 1, Homestead Valley Addition | 10-22-27 | —— | 16.30 |
| Lot 21, Block 1, Homestead Valley Addition | 8-29-27 | 1926 | 16.30 |
| Reserve, less tract N100 S300 E67 | 4- 2-28 | —— | 190.90 |
| Lot 12, Block 1, Homestead Valley Addition | 11-13-28 | —— | 16.30 |
| | | | $1,014.40 |

Said taxes being paid beginning with the year 1926, in December of each year, under section 6053, 11 Okl.St.Ann. § 280, the said restricted owner of said restricted lots was required to bring action within 60 days after the passage of the ordinance. No such action was instituted.

Act of April 12, 1926, 44 Stat. 239, "putting in force, in reference to suits involving Indian titles, the statutes of limitations of the State of Oklahoma," has application as to this sewer lien on said lots, that involving encumbrance upon the land and therefore the title to the land being involved.

See sections 6240, Okl.Stat.1931, and Service Feed Co. v. City of Ardmore, 171 Okl. 155, 42 P.2d 853, and City of Shawnee v. Taylor, 171 Okl. 185, 42 P.2d 860.

The County Treasurer in collecting this sewer assessment was acting merely as the agent of the City of Tulsa, having no interest therein whatever in said matter. The ad valorem tax assessed covered municipal, county, school district, and state purposes, being accordingly collected by the county treasurer and paid to the state treasurer, and on requisitions of the Boards of County Commissioners, school boards, and appropriate town and city officials, or boards, to the payees therein, and when a failure in such ad valorem tax or deficiency occurs, such ad valorem tax may be re-levied to restore the same. In the case of such sewer tax no ad valorem or other such tax can be levied by the county to replace same on the other lots. The owner of this land, Pansy B. Hawk, within a certain time, if she had

any just complaint against this sewer assessment, had an adequate remedy, either in her name or on the part of the United States government for her, to bring suit in apt time to set same aside, and in that event, the City of Tulsa through its proper authorities could have made a re-assessment on the lots in the addition subject to such assessment to cover such deficiency. See Powell v. City of Ada, supra.

No such action was taken but on the lots in said addition owned and held by her, the sewer assessment or tax was paid in apt time without any penalty or interest, which was received by the holders of assessment certificates or warrants issued to the contractor.

The said allottee neither herself nor the United States Government for her having brought appropriate action within 60 days as provided by the statute, in so far as this sewer assessment encumbrance or tax is concerned, is barred by the statutes of limitations.

In United States v. Southern Surety Company, et al., supra, the said Surety Company by its cross-bill or cross-answer raised a controversy between it and the co-defendants, the City of Muskogee and the County of Muskogee, in respect to the money paid by the said Surety Company for said certificates and it was there held that the United States for its said restricted ward was entitled to have said certificates and assessments on said tract of land canceled, and judgment against the city but not against the county for recovery of said assessment. In the opinion it is said: "The question arises as to whether recovery may be had by said Surety Company against the city of Muskogee for the amount paid for said certificates, together with interest at the rate of 6 per cent. per annum from that date. * * * The plaintiff will be awarded the relief prayed for, and the Southern Surety Company, under admitted facts, is also entitled to a judgment against city of Muskogee * * * with interest at the rate of 6 per cent. per annum from August 11, 1916."

No money judgment in any way was awarded against the County Treasurer or the Board of County Commissioners of Muskogee County.

Only the Board of Commissioners of Tulsa County was made defendants in the instant case, the city of Tulsa not being joined as a party thereto, either plaintiff or defendant.

I accordingly concur in the judgment of the lower court insofar as it provided for recovery in the sum of $2,412.21, covering the ad valorem tax in the sum of $2,141.86, and penalty therein for $231.35, and redemption fees for $39.00, aggregating the said sum, but insofar as it sustains the recovery as to the sewer assessments, denominated a tax, in the sum of $1,014.40, I most respectfully dissent.

Even if the mandatory law required the recovery of the assessment paid, it seems to me that interest should not be allowed. The state statutes neither provide for the recovery of the principal sum of the assessment, nor for interest. The county treasurer was acting as an agent for the city of Tulsa, without any discretion in the matter, to collect the sewer tax and to pay it over to the holder of the warrants. There is no way for the county to protect itself by causing through its agents an ad valorem tax to be levied by the City of Tulsa, for replacement, nor to require the said city to make a new assessment. This burden will be placed on the taxpayers of the county outside of the city as well as within it. Had the statutes of limitations not run and the City of Tulsa been made a party defendant in this action, as it was in United States v. Southern Surety Company, supra, a judgment could have been taken against the city, and the city could have caused a new assessment to have been made against the other lot-holders in said addition. Powell v. City of Ada, supra.

The state having provided for adequate relief against a person's lots that were placed in the assessment, when they should not have been placed there, this improvement being for the public health and comfort, a sound public policy would neither penalize the county, nor treasurer, and in any event, no interest should be given.